# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Geraldine Soat Brown | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 4893 | **DATE** | 4/8/2004 |
| **CASE TITLE** | | Woods vs. Barnhart | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set out in the Memorandum Opinion and Order, Plaintiff's motion for summary judgment [17-1] is GRANTED, Defendant's motion for summary judgment [25-1] is DENIED, and the case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. This is a final judgment and order. Terminate case. *Geraldine Soat Brown*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | | |
|---|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | number of notices | **Document Number** |
| | No notices required. | | | | | |
| ✓ | Notices mailed by judge's staff. | | | | APR 09 2004 | |
| | Notified counsel by telephone. | | | | date docketed | 27 |
| | Docketing to mail notices. | | | | | |
| ✓ | Mail AO 450 form. | | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | | 4/8/2004 date mailed notice | |
| GR | courtroom deputy's initials | | U.S. DISTRICT COURT CLERK 2004 APR -9 PM 3:51 Date/time received in central Clerk's Office | | GR mailing deputy initials | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

TROY WOODS,          )
      Plaintiff,    )     Cause No. 02 C 4893
                )
v.               )     Magistrate Judge Geraldine Soat Brown
                )
JO ANNE B. BARNHART.,   )
COMMISSIONER OF      )
SOCIAL SECURITY,      )
      Defendant.    )
                )

DOCKETED

APR 0 9 2004

## MEMORANDUM OPINION AND ORDER

Plaintiff Troy Woods brought this action pursuant to 42 U.S.C. § 405(g) for judicial review of the decision of the Commissioner of Social Security. Plaintiff applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on or around June 9, 2000. (R. 77-79, 288-289.)[1] Plaintiff's claims were denied initially and on reconsideration, and a hearing was held before an Administrative Law Judge ("ALJ") on November 19, 2001. (R. 295, 297.) The ALJ issued an unfavorable decision on January 22, 2002, and the Appeals Council declined to review Plaintiff's claims. (R. 19, 4-5.) The parties have consented to the jurisdiction of a magistrate judge [dkt 11, 12], and have each filed a motion for summary judgment. [Dkt 17, 25, 22]. For the reasons stated below, Plaintiff's motion is granted, Defendant's motion is denied, and the case is remanded for further proceedings consistent with this decision.

---

[1] The regulations regarding DIB and SSI are substantially similar and where they do not significantly differ, only one section will be cited. *See Ashpaugh v. Apfel*, No. 98 C 6561, 2000 WL 1222153 at *1 n. 3 (N.D. Ill. Aug. 22, 2000) (Ashman, M.J.).

"R.____" refers to the certified record of proceedings, evidentiary documents, and administrative hearing transcripts prepared by the Social Security Administration's Office of Hearings and Appeals pursuant to 42 U.S.C. § 405(g).

## BACKGROUND

Plaintiff was born in 1972 and was twenty-eight years old at the time of the hearing. (R. 77, 301.) He graduated from high school and completed one year of college. (R. 97.) Since 1992, Plaintiff has worked as a video store clerk, emergency medical technician, office manager, cigar shop manager, parts manager, and, most recently, technical customer service representative. (R. 92, 117-18, 302.)

### A.    Medical Evidence

Plaintiff alleges disability based on chronic Crohn's disease and a lower back injury.[2] (R. 91.) Plaintiff has been most recently treated by two physicians, Dr. Terry Ostrowski and Dr. Wanchai Sangchantr.[3]

Plaintiff was apparently first diagnosed with Crohn's disease in 1984. (R. 218.) Subsequent radiographs of Plaintiff's abdomen taken on July 24, 1993 indicated that "[e]arly Crohn's disease cannot be excluded," as "[f]indings consistent with Crohn's disease is identified in the distal ileum." (R. 272.) Plaintiff had recurrent abdominal pain, increased bloating and Crohn's related flare ups through 1995. (R. 200, 203.) He also was unable to eat solid foods during this time. (R. 203.) On

---

[2] Crohn's disease (also called regional enteritis or regional ileitis) is an inflamation of the small intestine. The condition is accompanied by crampy abdominal pain, diarrhea, anorexia and loss of weight. The disease is marked by patchy inflamation and deep ulcers which may form fistulas. J. E. Schmidt, *Attorneys' Dictionary of Medicine*, Vol. 2, C-500; Vol. 5, R-76 (Matthew Bender, December 2003).

[3] The ALJ and the parties refer to Dr. Ostrowski as a "family doctor," "internist," "primary physician," and "treating physician." (R. 315; Pl.'s Mem. at 5, 6; Def.'s Mem. at 3.) The ALJ and the parties refer to Dr. Sangchantr as a gastroenterologist. (R. 315; Pl.'s Mem. at 5; Def.'s Mem. at 3.) Dr. Sangchantr is also identified as a "gastroentology consultant" in a report of Plaintiff's 1995 surgery. (R.146.)

August 25, 1995, Plaintiff underwent surgery to address bowel obstruction and multiple entero-enteric fistulas associated with his Crohn's disease. (R. 145-150.) That procedure involved an exploratory laparotomy[4] with extensive enterolysis[5], an enterotomy[6] with decompression of an obstructed small bowel, the closure of an ileojejunal fistula[7], the closure of the ileosigmoid[8] and the resection of the terminal ileum and right colon. (R. 145.) Plaintiff's postoperative diagnosis included "Crohn's disease with near complete distal ileal small bowel obstruction." (*Id.*)

Between his surgery on August 1995 and May 2000, Plaintiff had only periodic complaints of symptoms related to Crohn's disease. On September 16, 1996, Dr. Ostrowski reported that Plaintiff's abdominal pain was "rare" and that he was "eating good." (R. 198.) On December 3, 1996, Dr. Ostrowski reported that Plaintiff's abdominal pain was "occ[asional]" but that his appetite had diminished and his weight was down. (*Id.*) On April 24, 1997, Dr. Ostrowski reported that Plaintiff had complained of "mild abd[ominal] pain – still some diarrhea." (R. 197.)

On June 2, 1997, Plaintiff reported having been in a car accident. (R. 197, 311.) He was seen again about two weeks later and complained that his back was still causing him pain. (R. 196.) Plaintiff had an MRI of his lumbar spine taken on August 5, 1997, which indicated the presence of

---

[4] A laparotomy is a surgical cut through the wall of the abdomen for the purpose of exploring the interior of the abdomen to aid in giving a diagnosis. *Id.* at Vol. 3, L-33.

[5] Enterolysis is a surgical procedure whereby the intestine is freed from adhesions. *Id.* at Vol. 2, E-126.

[6] An enterotomy is a surgical cutting into the intestines. *Id.* at Vol. 2, E-127.

[7] A fistula is an abnormally formed canal or passage that can be formed by ulceration, the erosion of an ulcer, or the failure in the healing process of a penetrating wound. *Id.* at Vol. 2, F-1000.

[8] Ileosigmoid refers to part of the small and large intestines. *Id.* at Vol. 3, I-22.

a degenerating disc with central disc protrusion and grade 1 anterior slippage. (R. 259.) Plaintiff was diagnosed with acute cervical strain on May 4, 1998, although x-rays of Plaintiff's cervical and lumbar spine taken on that date were "normal." (R. 123, 127-28.) On September 24, 1998, Plaintiff reported some pain and bloating after he was taken off Methotrexate.[9] (R. 193.) Between December 14, 1998 and January 13, 1999, Plaintiff underwent six physical therapy sessions to treat his lower back pain. (R. 171.) After those sessions, Plaintiff reported that he had "occasional soreness" following heavy activity but was otherwise "pain-free." (Id.) On May 11, 1999, Plaintiff reported "no abd[ominal] pain." (R. 192.)

On March 11, 2000, Dr. Ostrowski noted that Plaintiff had suffered two weeks of abdominal pain in addition to back pain. (R. 191.) On May 27, 2000, Plaintiff underwent a colonoscopy[10] with biopsies performed by Dr. Sangchantr. (R. 120.) In his report regarding the "indications for surgery," Dr. Sangchantr indicated that Plaintiff had been "doing well" since his previous surgery in 1995 and had been taking Methotrexate once a week. (Id.) Dr. Sangchantr indicated that Plaintiff had recently developed recurrent abdominal pain "with occasional loose stool without diarrhea." (Id.) According to the report, the more Plaintiff ate, the more he had pain. (Id.) The report also indicated that Plaintiff did not like to take Prednisone because it produced "discomfort mentally." (Id.) In his report regarding the "findings and procedure" following the surgery, Dr. Sangchantr noted the presence of inflamation and ulcerations, and ordered changes to Plaintiff's medication. (R. 121.)

---

[9] Methotrexate is used to treat cancer and to diminish or check the immunological response of the body. Id. at Vol. 4, M-176.

[10] A colonoscopy is the visual examination of the interior of the colon. Id. Vol. 2, C-359.

On July 6, 2000, Plaintiff was still taking Prednisone for his Crohn's disease, but he reported that the abdominal pain persisted. (R. 191.) Dr. Ostrowski noted that Plaintiff had three to four loose bowel movements a day. (*Id.*) On August 3, 2000, Dr. Ostrowski completed a Gastro-Intestinal Report for the Bureau of Disability Determination Services ("DDS"). (R. 133-134.) In that report, Dr. Ostrowski listed his current diagnosis as "Crohn's disease[;] Low back symptom." (R. 133.) He noted that Plaintiff had no persistent or recurrent ascites,[11] ulceration, bloody stools, or persistent systemic manifestations. (R. 133.) He also noted, however, that Plaintiff had persistent or recurrent intestinal obstruction demonstrated by abdominal pain and distention. (R. 134.)

On August 16, 2000, Dr. Virgilio Pilapil, a state agency physician, completed a Physical Residual Functional Capacity Assessment for the DDS. (R. 156-163.) He concluded that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently, could sit, stand and/or walk for six hours in an eight hour work day, and was unlimited in his ability to push or pull. (R. 157.) He opined that Plaintiff should be capable of performing medium level work by May 2001. (R. 163.) On August 16, 2000, another doctor, Robert T. Patey, reviewed the medical evidence and affirmed Dr. Pilapil's assessment of Plaintiff's limitations. (R. 156.) Dr. Patey's qualifications were not found in the record.

On November 24, 2000, Dr. Ostrowski completed a second Gastro-Intestinal Report for DDS. (R. 136-37.) Dr. Ostrowski noted in that report that Plaintiff continued to have abdominal pain described as cramping. (R. 137.) He also noted that same day that Plaintiff had a diminished appetite. (R. 190.) On December 21, 2000, Dr. Sangchantr completed a Gastro-Intestinal Report for DDS. (R. 138-140.) Dr. Sangchantr diagnosed Plaintiff with Crohn's disease. (R. 139.) He also

---

[11] Ascites is abnormal accumulation of fluid in the abdomen. *Id.* at Vol. 1, A-565.

noted that there were no recurrent ascites or gross blood in his stool, but that there were recurrent ulcers in his colon and ileum and recurrent abdominal pain, which was made worse by stress. (*Id.*) He further observed that Plaintiff's response to treatment was "limited" and " variable." (R. 140.) He also noted the presence of "abdominal pain and fatigue," which he described as "variable." (*Id.*) Finally, in response to a question regarding Plaintiff's ability to do "work related activities," Dr. Sangchantr stated: "[Plaintiff] can move freely, but, when the abdominal pain occurs, it is very difficult, torturous, for him to function. He is a stoic man, usually does not complain." (*Id.*)

On March 23, 2001, Dr. Ostrowski completed a Medical Assessment of Condition and Ability to Do Work-Related Activities ("Medical Assessment"). (R. 180-183.) Dr. Ostrowski stated that, since his surgery in 1995, Plaintiff "has had a recurrent bout of abdominal pain and is on Methotrexate and occasional Prednisone." (R. 180.) He opined that Plaintiff's condition was "unchanged since surgery" in 1995. (*Id.*) He did not impose significant limits on Plaintiff's ability to stand, walk or sit; he stated that Plaintiff could sit, stand and walk for six hours in an eight hour day and could sit, stand and walk for four hours uninterrupted. (R. 181.) He also stated that Plaintiff could lift and carry 15 pounds occasionally, and bend, push and pull occasionally. (*Id.*) He noted, however, that there was "day to day variation in [Plaintiff's] ability [and] duration of functioning." (*Id.*) He also noted that Plaintiff's medications may cause drowsiness, but stated that Plaintiff did not, to his knowledge, need to lie down intermittently throughout the day. (R. 181-82.) Dr. Ostrowski concluded that Plaintiff may require more visits to the bathroom during a flare-up. (R. 182.) He also concluded that Plaintiff would have "marked limitations" in his ability to complete a normal workday and workweek and perform at a consistent pace without an unreasonable number and length of rest periods "if work was sedentary." (*Id.*)

6

On October 1, 2001, Plaintiff reported that his abdominal pain had responded to an increased dose of Prednisone. (R. 185.) He further reported that he was continuing to use Ultram for his back pain. (*Id.*) An October 29, 2001 x-ray of Plaintiff's lumbosacral spine suggested muscle spasm, but did not indicate any compression fracture deformity or significant osteoarthritic changes. (R. 287.)

The medical records indicate a steady drop in Plaintiff's weight during 2000 and 2001. At the time of his May 27, 2000 colonoscopy, Plaintiff weighed 168 pounds. (R. 120.) On November 24, 2000, his weight was down to 156 pounds. (R. 136.) On July 10, 2001, Plaintiff suffered more "weight lossage" [sic].[12] (R. 185.) On October 1, 2001, Plaintiff weighed 147½ pounds, and on October 11, 2001 he weighed 146 pounds. (R. 184-85.)

## B.    Plaintiff's Testimony

At the hearing before the ALJ, Plaintiff testified that he had been able to maintain employment following his surgery in 1995. (R. 303-04.) He stated, however, that even during that period of time he was forced to take time off work for medical reasons, which eventually forced him to resign from at least one job. (R. 304.) Plaintiff explained that his last job had ended because:

> [His] Crohn's was acting up. [He] was having flare-ups. And also, at the time, [he] was having pretty bad back pain and [he] was taking medication for that, which made [him] drowsy and [he] wasn't performing well at work. . . . [A]fter the flare-ups, [he] took off from work for a lengthy period of time. [He] went back to work. [He] worked for one week and [he] had to take off. [He] ended up taking off from work again, with the understanding that if [he] went back to work and had to take off another time, that [he'd] be fired. . . . And after some time and getting a call every day from [his] boss, for about a month or so . . . [his boss] would call [him] . . . every day. And [he] didn't see where [he] was getting better, so [he] had to quit the job.

---

[12] It appears that Plaintiff's weight was down to 152½ pounds at this time, but the record submitted is not entirely legible. (R. 185.)

(R. 302-03.) Plaintiff concluded that, as of May 2000, when his last job ended, he was no longer able to hold a job. (R. 86, 91.)

When questioned as to why he could not work now, Plaintiff testified that while he felt he could *get* a job, he did not feel he would be able to maintain one as his "physical health varies on a weekly basis." (R. 305.) Plaintiff testified that, during a bad week, he suffers from stomach cramps and soreness. (*Id.*) He also suffers from weakness as a result of his diminished food intake to combat the cramping. (*Id.*) Plaintiff testified that his cramps last several hours, during which time he has to lie down and is unable to do anything. (*Id.*) Plaintiff testified that on a busy day during a flare-up of his Crohn's disease, he will use the bathroom about six times a day and will need to remain there for some time during each use. (R. 306-07.) He testified that on a non-busy day during a flare-up, he will go to the bathroom about twice a day because he is not eating much. (*Id.*) Plaintiff testified that there is no set schedule with respect to his need to use the bathroom. (*Id.*)

Plaintiff testified that he has flare-ups about once a week, and they can last several hours or longer than one day. (R. 308.) He testified that he does not have a lot of energy and does not eat much on a "pretty frequent" basis. (*Id.*) He testified that on a good day, which he has about 10-15 times a month, he can grocery shop, go to the bank and run errands. (R. 309.) On a bad day, he testified that he remains in bed all day, watches television, rests, and reads. (R. 314.) Plaintiff testified that he does not socialize or go out anymore except to an occasional movie. (R. 310.) He used to go to parties, bike, and help with chores. (*Id.*) He testified that his weight has been dropping continuously and he had lost over 20 pounds between his surgery in May 2000 and the hearing in November 2001. (R. 308.)

With respect to his lower back pain, Plaintiff testified that he has a bulging degenerated disk

that causes him pain and requires him to limit his activities. (R. 311-312.) He testified that while he occasionally wears a back brace, he can carry a bag of groceries and a case of soda; however, he injured himself on one occasion simply by twisting his body the wrong way while getting out of a car. (R. 312-13.) Plaintiff testified that he can stand and walk "fairly well" when he is not having cramps, but that his back pain can be aggravated by activities such as doing dishes, sweeping, mowing and shoveling. (R. 312.) Plaintiff reported that the medication that he takes for his back pain makes him "somewhat groggy making work difficult." (R. 91.)

Plaintiff testified that at the time of the hearing, he was taking Soma,[13] Prednisone,[14] Lodine,[15] Ultram[16] and Methotrexate. (R. 116, 298.) He testified that side effects from his medications include joint pain, depression and drowsiness, as well as becoming "pretty high and pretty forgetful about things." (R. 313.) He testified that he will not drive if he is on a high dose of Soma or Ultram because of the drowsiness caused by those medications. (R. 319.) Plaintiff stated that on a bad day, he will take as much as six doses of Soma which causes him to sleep for most of the day. (R. 317.) Plaintiff testified that that had been happening about twice a week. (*Id.*) In addition, Plaintiff has had some trouble retaining what he reads when he is on high doses of medication. (R. 324.)

Plaintiff testified that he is supposed to see Dr. Ostrowski at least once every three months,

---

[13] Soma is used for the treatment of bone and muscle pain. Potential side effects include drowsiness. *Id.* at Vol. 5, S-203.

[14] Prednisone is used to treat inflamation. *Id.* at Vol. 4, P-399.

[15] Lodine is used for the relief of pain and the treatment of osteoarthritis. *Id.* at Vol. 3, L-171.

[16] Ultram is used in the management of pain. *Id.* at Vol. 6, U-12.

but that he is without health insurance and cannot afford to see him more than once every five months. (R. 315.)

### C.     Vocational Expert's Testimony

James Radke, a vocational expert (the "VE"), also testified at Plaintiff's hearing. (R. 295, 324-28.) The VE testified that a person of Plaintiff's age, education, and work experience, who could lift up to 20 pounds occasionally and 10 pounds frequently, sit, stand or walk as required, and push or pull weights occasionally, could perform several occupations in the regional economy. (R. 325-326.) He stated that such a person could perform work as a transportation ticket and reservations clerk (6,000 light level jobs); cashier (55,700 jobs); inventory and material recording clerk (2,700 jobs); interviewer (2,800 jobs); and record clerk (1,200 jobs). (R. 326.) The VE stated, however, that if Plaintiff was required to be absent from work more than once or twice a month, all work "on a competitive basis" would be eliminated. (R. 326.) He also stated that if Plaintiff could not perform detailed or complex tasks on a sustained basis, he would have difficulty performing any job involving finances or cash, or any skilled occupation, which he described most of the aforementioned jobs as being. (R. 326-27.) The VE stated that that restriction would leave 8,100 unskilled cashier positions, 1,400 interviewing positions, 3,600 administrative support jobs, and 12,400 light level cleaning positions. (R. 327.) He noted that if an employee needed to take unscheduled bathroom breaks, the cashier jobs would essentially be eliminated and the interviewer positions would be difficult. (R. 328.) He also stated that if an employee needed to take up to six bathroom breaks per day on an unscheduled basis and for an unpredictable length of time, a large number of employers would find that practice intolerable and, over time, it would be problematic.

(*Id.*) The VE did not state whether that requirement would render Plaintiff unemployable.

## THE ALJ'S DECISION

The Social Security Regulations ("Regulations") prescribe a sequential five-part test for determining whether a claimant is disabled. 20 C.F.R. § 416.920 (2003). Under this test the Social Security Commissioner must consider: (1) whether the claimant has performed substantial gainful activity during the period for which he claims disability; (2) if he has not performed any substantial gainful activity, whether the claimant has a severe impairment or combination of impairments; (3) if the claimant has a severe impairment, whether the claimant's impairment meets or equals any impairment listed in the Regulations as being so severe as to preclude substantial gainful activity; (4) if the impairment does not meet or equal a listed impairment, whether the claimant retains the residual functional capacity ("RFC"), despite his impairment, to perform his past relevant work; and (5) if the claimant cannot perform his past relevant work, whether the claimant is able to perform any other work existing in significant numbers in the national economy, considering his RFC together with his age, education, and work experience. *Id.*; *see also Young v. Secretary of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). The claimant bears the burden of proof at steps one through four; the burden shifts to the Commissioner at step five. *Young*, 957 F.2d at 389.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset of disability date. (R. 15, 18.) At step two, the ALJ found that Plaintiff has a severe impairment, namely, Crohn's disease and a history of low back strain. (*Id.*) At step three, the ALJ concluded that Plaintiff's impairment does not meet the requirements or equal the level of severity contemplated for an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (*Id.*)

11

Between step three and step four, the ALJ assessed Plaintiff's RFC. (R. 15.) As the ALJ described, the RFC is what the claimant can still do in spite of his limitations. (*Id.*) The ALJ concluded that Plaintiff was precluded from lifting more than 20 pounds occasionally or 10 pounds frequently, bending or pushing/pulling with weights more than occasionally, and "understanding, remembering and/or carrying out detailed and/or complex instructions." (R. 15, 18.) The ALJ's conclusion was based on her finding that the medical evidence failed to provide strong support for Plaintiff's allegations of disabling symptoms and limitations. (R. 16, 18.)

In assessing the medical evidence with respect to Plaintiff's Crohn's disease, the ALJ stated that three months after his May 2000 surgery, Plaintiff's doctor noted "no operable fistula, systemic manifestations or recurrent bloody stools." (R. 16.) The ALJ further noted that Plaintiff "is on chronic suppression therapy and his condition has been unchanged since his 1995 surgery; *i.e.,* he is subject to periodic flares and fluctuations in weight but generally responds to increases in steroid dosage." (*Id.*) Later in her decision, the ALJ stated: "Despite [Plaintiff's] testimony of weekly flare-ups and twice-weekly significant back pain, the only documented flare of Crohn's disease was in May 2000. As indicated earlier, his condition in this regard is basically unchanged from 1995. Yet, for many of those years he was able to maintain employment." (R. 17.) The ALJ also stated that although Plaintiff reported a worsening of symptoms, "he has not required any further testing, much less a referral to a gastroenterologist, thereby undermining his contention of increasing problems. His treating doctor's notes certainly do not support his assertion of increasing problems." (*Id.*) In addition, the ALJ stated: "Another issue is the frequency of bowel movements, which [Plaintiff] testified is unpredictable and up to six per day during a flare. However, his doctor documents three at most . . . , a considerable discrepancy." (*Id.*) (citation omitted).

12

With respect to Plaintiff's back condition, the ALJ noted that although Plaintiff "has continued to complain of back pain . . . he has no trouble standing or walking . . . [and] a recent x-ray was negative aside from some suggestion of muscle spasm." (R. 16.) She also noted that "there is objectively very little to support [Plaintiff's] complaints" of back pain and "the pain medication he has been prescribed has not been particularly significant." (R. 17.) The ALJ concluded that her RFC finding was justified based on the objective medical evidence and consideration of the factors described in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) and Social Security Ruling ("SSR") 96-7p. (R. 16-17.)

At step four, the ALJ concluded that Plaintiff was unable to perform any of his past relevant work. (R. 17, 18-19.) At step five, the ALJ concluded that, based on her RFC determination, Plaintiff could perform "a limited range of light work." (R. 17.) The ALJ then relied on the VE's testimony that a hypothetical individual with Plaintiff's vocational characteristics and RFC could perform the job of cashier (8,100 jobs), interviewer (1,400 jobs) and administrative support person (3,600 jobs). (R. 18, 19.) The ALJ concluded that those jobs constituted a significant number of jobs in the economy, and that Plaintiff was therefore not disabled within the meaning of the Social Security Act. (*Id.*)

## LEGAL STANDARD

The Social Security Act provides for limited judicial review of a final decision of the Commissioner (effectively that of the ALJ where, as here, the Appeals Council has denied the applicant's request for review). Where the ALJ commits an error of law, "reversal is required without regard to the volume of the evidence in support of the factual findings." *Imani v. Heckler,*

797 F.2d 508, 510 (7th Cir. 1986). With respect to the ALJ's conclusions of fact, the reviewing court's role is limited. There, the role of the district court is only to determine whether the decision of the ALJ is supported by substantial evidence in the record. *Wolfe v. Shalala*, 997 F.2d 321, 322 (7th Cir. 1993). In reviewing the Commissioner's decision, the court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *Brown v. Chater*, 913 F. Supp. 1210, 1213-14 (N.D. Ill. 1996). Thus, the court does "not substitute [its] own judgment for that of the ALJ." *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997). Rather, the court must affirm a decision if it is supported by substantial evidence and the ALJ has made no error of law. *Herr v. Sullivan*, 912 F.2d 178, 180 (7th Cir. 1990); *Edwards v. Sullivan*, 985 F.2d 334, 336-37 (7th Cir. 1993). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

When evaluating a disability claim the ALJ must consider all relevant evidence and may not select and discuss only that evidence that favors her ultimate conclusion. *Herron*, 19 F.3d at 333. Where conflicting evidence allows reasonable minds to differ, the responsibility for resolving the conflict falls on the ALJ, not the court. *Herr*, 912 F.2d at 181; *see also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) ("[t]he ALJ has the authority to assess medical evidence and give greater weight to that which he finds more credible"). Where there is a conflict between medical opinions, the ALJ may choose between those opinions but may not substitute her own lay opinion for that of the medical professionals. *Davis v. Chater*, 952 F. Supp. 561, 566 (N.D. Ill. 1996). "A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling

14

weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (citing 20 C.F.R. § 416.927(d)(2)).

Although the district court's role is limited to determining whether the ALJ's final decision is supported by substantial evidence and based upon proper legal criteria, that does not mean that the ALJ is entitled to unlimited judicial deference. Regardless of whether there is adequate evidence in the record to support the ALJ's decision, the ALJ must build an accurate and logical bridge from the evidence to her conclusions, because the court confines its review to the reasons supplied by the ALJ. *Blakes ex rel Wolfe v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003). If the evidence on which the ALJ relied does not support the ALJ's decision, the decision cannot be upheld. *Id.* The ALJ must state her reasons for accepting or rejecting "entire lines of evidence," although she need not evaluate in writing every piece of evidence in the record. *See Herron*, 19 F.3d at 333; *see also Young*, 957 F.2d at 393 (ALJ must articulate his reason for rejecting evidence "within reasonable limits" in order to allow for meaningful appellate review). An ALJ's opinion cannot contain conflicting factual determinations. *Smith v. Massanari*, No. 00 C 7504, 2001 WL 936123 at *1 (N.D. Ill. Aug. 16, 2001) (Shadur, J.).

## DISCUSSION

Plaintiff argues that the ALJ made several errors in her determination that Plaintiff was not disabled. Specifically, Plaintiff argues that: (1) the ALJ's decision is not supported by substantial evidence; (2) the ALJ failed to discuss or evaluate evidence favorable to Plaintiff; and (3) the ALJ's credibility determination violated SSR 96-7p. (Pl.'s Mem. at 7-14.)

A.      Was the ALJ's Decision Supported by Substantial Evidence?

Plaintiff argues that the ALJ's decision was not supported by substantial evidence because the ALJ did not consider the episodic nature of his Crohn's disease or take into account the effect that his flare-ups had on his ability to perform work on a sustained basis. (*Id.* at 7-11.) Defendant argues that the ALJ "reasonably found that [Plaintiff's] flare-ups, with the exception of the flare-up in May 2000, were no more severe than those which had occurred while Plaintiff was working full-time between 1995 and 2000," and that the ALJ was therefore correct in finding that Plaintiff was able to perform work after May 2000. (Def.'s Mem. at 7-8.)

In support of his argument, Plaintiff first disputes the ALJ's conclusion that his condition was "unchanged" since his 1995 surgery. On that issue, the ALJ concluded:

> [H]is condition has been unchanged since his 1995 surgery; i.e., he is subject to periodic flares and fluctuation in weight but generally responds to increases in steroid dosage .... As indicated earlier, his condition in this regard is basically unchanged from 1995. Yet, for many of those years he was able to maintain employment .... His treating doctor's notes certainly do not support his assertion of increasing problems.

(R. 16, 17.)

Both of the parties presume that the ALJ relied on Dr. Ostrowski's March 2001 report in reaching her conclusion, wherein the doctor stated that Plaintiff's condition was "unchanged since surgery." (Pl.'s Mem. at 8; Def.'s Mem. at 7; R. 180).[17] The parties disagree, however, as to the meaning of Dr. Ostrowski's comment in his report. Plaintiff asserts that Dr. Ostrowski meant that "[Plaintiff's] condition had *again* become similar in severity to its level in 1995." (Pl.'s Mem. at

_____

[17] The ALJ cited Exhibits 4F and 8F in support of her conclusion. (R. 16.) Exhibit 4F is 18 pages long (R. 138-155) and Exhibit 8F is 109 pages long (R. 178-286). Thus, it is not certain which part(s) of the medical records the ALJ relied upon or whether the ALJ relied on Dr. Ostrowski's March 2001 report at all in reaching that conclusion.

8.) In support of his interpretation, Plaintiff argues that the medical records show that his Crohn's disease was far less severe during 1996-2000 than it was after his May 2000 flare-up. (*Id.* at 8, 8 n. 2.) Plaintiff also relies on his testimony that he was unable to sustain his job as a customer service representative due to his excessive absenteeism stemming from his Crohn's and that his day to day functioning varied depending on the severity of the Crohn's. (*Id.* at 8-9.) Defendant argues that Dr. Ostrowski's notation meant that there had been "no decline of Plaintiff's condition." (Def.'s Mem. at 8). In support of that interpretation, Defendant argues that the records indicate that Plaintiff was bloated and unable to eat solid foods prior to 1995, but did not have those problems after May 2000. (*Id.*)[18] Defendant also relies on the ALJ's consideration of the fact that no additional testing or more aggressive treatment was recommended to Plaintiff after 1995 (R. 17), and that, rather, Plaintiff continued to be treated with, and responded to, a fluctuating dose of steroids (R. 16), Plaintiff did not contact his gasteroenterologist after May 2000 (R. 17), Plaintiff did not experience systemic manifestations of the disease after May 2000 (R. 16), and Plaintiff could stand and walk without difficulty as long as his stomach was not cramping (R. 17). (Def.'s Mem. at 7-8, 10.)

The medical records show that Plaintiff's Crohn's disease was substantially less severe during the four-year period following Plaintiff's 1995 surgery (when Plaintiff was able to sustain regular employment) than it was after the May 2000 flare-up. For instance, the records between 1996 and September 23, 1999 reflect only occasional complaints of abdominal pain. Plaintiff's

---

[18] The ALJ did not address that evidence in her decision.

Also in support of her interpretation, Defendant argues that "the plain language of Dr. Ostrowski's opinion, using the terms 'remained' and 'unchanged since 1995' suggests no decline of Plaintiff's condition." (Def.'s Mem. at 8) (citing R. 180.) However, Dr. Ostrowski's report does not include the word "remained" and states "unchanged since surgery," not "unchanged since 1995." (R. 180)

abdominal pain was documented as "rare" on September 16, 1996 (R. 198), "occ[asional]" on December 3, 1996 (*id.*), "mild" on April 24, 1997 (R. 197), and non-existent on March 15 and May 11, 1999 (R. 192). In addition, the reports indicate that Plaintiff had "no new problems" on March 22, 1996 and was "eating good" on September 16, 1996 (R. 198-99), was "feeling ok" on July 20, 1998 (R. 195) and was "feeling better" on May 11, 1999 (R. 192). The records in 1997 and 1998 focus primarily on Plaintiff's back pain after Plaintiff reported having been in a car accident on June 2, 1997. (R. 194-97.)

In contrast, beginning in September 1999, nearly every medical record confirmed persistent complaints of abdominal pain and indicated that Plaintiff's Crohn's disease had become much more severe. On September 23, 1999, Dr. Ostrowski stated that Plaintiff was "not eating well" and had complained of an increase of blood in his stools. (R. 191.) On March 11, 2000, the doctor noted that Plaintiff had suffered two weeks of abdominal pain. (*Id.*) On May 27, 2000, Plaintiff had to undergo a colonoscopy with biopsies. (R. 120.) Subsequent to that surgery, on July 6, 2000, the doctor noted that Plaintiff was still suffering abdominal pain and was "on substantial med[ication] – b[owel] m[ovements] 3-4/day loose." (R. 191.) On November 24, 2000, Dr. Ostrowski noted that Plaintiff's weight and appetite were down again and that Plaintiff was still complaining of cramps. (R. 190.) On December 21, 2000, Dr. Sangchantr noted that "when the abdominal pain occurs, it is very difficult, torturous for him to function." (R. 140.) Dr. Sangchantr also noted that Plaintiff has a "limited response, variable" to treatment. (*Id.*) In February 2001, Dr. Ostrowski recorded that Plaintiff's weight was down, he was not eating, and he had increased abdominal pain. (R. 185.) On March 23, 2001, Dr. Ostrowski noted that Plaintiff had "day to day variation in his ability and duration of functioning." (R. 181.) On July 10, 2001, the doctor noted more weight loss and more

abdominal pain. (R. 185.)

Based on the medical evidence in the record, the ALJ erred in concluding that Plaintiff's condition had not changed since his 1995 surgery. Rather, the evidence shows a marked difference in Plaintiff's condition beginning on September 23, 1999. While Plaintiff could work within a limited light RFC on "good days," he could not do so on "bad days," *i.e.*, when experiencing abdominal pain or increased diarrhea. Plaintiff's testimony supports that conclusion, *i.e.*, that he was essentially bed bound and unable to perform any activities on his bad days. While the ALJ acknowledged that Plaintiff has "persistent crampy abdominal pain" (R. 16), "is subject to periodic flares and fluctuations in weight" (*id.*), "can stand and walk without difficulty as long as his stomach is not cramping" (R. 17), has "day to day variation in [his] ability and duration of function" (*id.*), and "may require more visits to the bathroom during flare-ups" (*id.*), she did not explain how those contingencies enabled him to function on a daily basis as he had done between his 1995 surgery and May 2000.

As Plaintiff argues, although he could perform daily activities on his "good days," minimal daily activities do not establish that a person is capable of engaging in substantial gainful activity. (Pl.'s Mem. at 10-11.) *See Clifford*, 227 F.3d at 870, 872 (stating that "minimal daily activities, such as [walking six blocks, performing chores and shopping] do not establish that a person is capable of engaging in substantial physical activity"); *Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000) (claimant's testimony that she was significantly limited in prolonged sitting, standing and walking was not contradicted by her ability to care for her house and children, as that type of work "provides the type of flexibility to alternate standing, sitting and walking, and to rest and elevate the legs when necessary"); *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (reversing and remanding

19

ALJ's decision where the ALJ "failed to consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week"); *Dix v. Sullivan*, 900 F.2d 135, 138 (8th Cir. 1990) ("Although [claimant] can occasionally go fishing or engage in some light activities, 'sporadic or transitory activity does not disprove disability.'"); *Caviness v. Apfel*, 4 F. Supp. 2d 813, 822 (S.D. Ind. 1998) (finding that the ALJ failed to differentiate between the claimant's good days and days when the claimant was having flare-ups when he concluded that the claimant's daily activities were inconsistent with her subjective complaints). The rule that minimal daily activities do not establish a person's ability to perform substantial gainful activity is particularly applicable here, where the activities identified by Plaintiff (grocery shopping, running errands, standing and walking) are by their nature flexible and allow Plaintiff to rest and take breaks as deemed necessary. (R. 309, 312-13.)

Finally, there is also tension between the ALJ's finding that Plaintiff's condition is substantially unchanged since 1995 and the ALJ's conclusion (at step four) that Plaintiff is unable to perform any "past relevant work." The ALJ fails to explain why Plaintiff is unable to perform even his least demanding relevant jobs (R. 17), if, in fact, his condition has been unchanged since his 1995 surgery. (R. 16.)

Because the ALJ incorrectly found that Plaintiff's condition had not changed since his 1995 surgery, and failed to explain how his flare-ups (or the episodic nature of Plaintiff's symptoms) permitted him to perform work on a sustained basis, the ALJ's decision is not supported by substantial evidence. In light of that error, the ALJ's conclusion that Plaintiff is capable of maintaining regular employment must be revisited.

**B.    Did the ALJ Fail to Discuss or Evaluate Evidence Favorable to Plaintiff?**

In a related argument, Plaintiff argues that the ALJ's decision was erroneous because the ALJ failed to adequately discuss certain evidence favorable to Plaintiff. (Pl.'s Mem. at 11.)  First, Plaintiff argues, the ALJ did not acknowledge or analyze the December 21, 2000 opinion of Dr. Sangchantr, Plaintiff's gastroenterologist, that Plaintiff "can move freely, but, when the abdominal pain occurs, it is very difficult, torturous for him to function," an opinion which Plaintiff contends shows his inability to function during a flare-up. (*Id.*) (citing R. 140.)  In addition, Plaintiff argues, the ALJ did not adequately discuss the persistent complaints of abdominal pain and steady weight loss found in Dr. Ostrowski's records after May 2000. (Pl.'s Mem. at 11-12.)  According to Plaintiff, the ALJ's comment that Plaintiff "is subject to periodic flares and fluctuations in weight, but generally responds to increases in steroid dosage (Exhibits 4F and 8F)" is not an accurate reflection of Dr. Ostrowski's records. (*Id.* at 12) (citing R. 16).

Defendant argues that the ALJ's discussion of Dr. Sangchantr's opinion was sufficient because the ALJ discussed the results of the colonoscopy performed by Dr. Sangchantr in May 2000, and omitted only the comments made by Dr. Sangchantr after that time which were based on Dr. Ostrowski's examinations of Plaintiff rather than his own. (Def.'s Mem. at 9.)  Defendant further argues that "not discussing one line of a doctor's report hardly constitutes a failure to discuss an entire line of evidence." (*Id.* at 8.)  With respect to Plaintiff's argument that the ALJ also failed to discuss Dr. Ostrowski's records indicating persistent complaints of abdominal pain and steady weight loss after May 2000, Defendant responds that the ALJ cited specific examples from Dr. Ostrowski's records to support her conclusion on this issue. (*Id.* at 9.)

The ALJ's decision "must be based on all relevant evidence in the record." *Cichon v.*

21

*Barnhart*, 222 F. Supp. 2d 1019, 1029 (N.D. Ill. 2002). The ALJ is not bound by the opinions of treating physicians, but is required to analyze and explain them. *See* 20 C.F.R. § 404.416.927(d)(2); *Scott v. Barnhart*, 297 F.3d 589, 596 (7th Cir. 2002) (stating that "the ALJ [must] consider [the claimant's] proffered medical evidence and articulate specific reasons for accepting or rejecting it"); *Cichon*, 222 F. Supp. 2d at 1030 (stating that "even if the ALJ reasonably believed [the physician's] report was not well supported . . . he had the duty to articulate these reasons"); *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984) ("It is more than merely 'helpful' for the ALJ to articulate reasons . . . for crediting or rejecting particular sources of evidence. It is absolutely essential . . . . [W]hen the ALJ fails to mention rejected evidence, 'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'") (quoting *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir.1981)). While the ALJ need not make a written evaluation of each piece of evidence, the ALJ may not fail to discuss "entire lines of evidence." *Herron*, 19 F.3d at 333.

The ALJ erred in failing to discuss any part of Dr. Sangchantr's December 21, 2000 report. Dr. Sangchantr stated that Plaintiff had recurrent ulcers in his colon and ileum, recurrent abdominal pain which was made worse with stress, and fatigue. (R. 139-40.) He stated that Plaintiff's response to treatment was "limited" and "variable." (R. 140.) In addition, as discussed above, he stated that it is "torturous" for Plaintiff to function when the abdominal pain occurs. (*Id.*) Such comments strongly suggest that Plaintiff's condition was not "unchanged" since 1995, particularly when compared with earlier reports where only "mild" abdominal pain was recorded. (R. 197.) The ALJ did not address Dr. Sangchantr's opinion, and should have done so given that it contains relevant evidence on the issue of Plaintiff's ability to perform work on a sustained basis. *See Cichon*, 222 F. Supp. 2d at 1029 (requiring the ALJ to consider all available medical evidence in the record); *see*

*also Scott*, 297 F.3d at 596 (the ALJ must consider the medical evidence and explain why it is being accepted or rejected); *Zblewski*, 732 F.2d at 79 (same).

Although Defendant argues that the ALJ omitted Dr. Sangchantr's December 2000 report from her discussion because it was not based on the doctor's own first-hand observations, that fact is never mentioned by the ALJ as a reason for discounting the report. Thus, that argument will not be considered here. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (stating that the court should "confine [its] review to the reasons supplied by the ALJ. . . . That is why the ALJ (not the Commissioner's lawyers) must 'build an accurate and logical bridge from the evidence to her conclusion.'"). Alternatively, if the ALJ failed to address Dr. Sangchantr's report because she believed it to be unclear for some reason, she had a duty to re-contact him for clarification before discounting it. *See* 20 C.F.R. § 416.912(e)(1) (stating that "when the report from [a] medical source contains a conflict or ambiguity that must be resolved . . . or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques," the SSA "[w]ill seek additional evidence or clarification from [the] medical source"). Defendant's argument that the ALJ merely failed to discuss "one line of a doctor's report" is also unavailing, as that is not the case here. The ALJ failed to address *any* of the comments in Dr. Sangchantr's December 2000 report, which is contrary to the ALJ's responsibility as described, for example, in *Herron*, 19 F.3d at 333. Thus, the ALJ's failure to address the December 2000 report of Dr. Sangchantr also requires that this case be remanded.[19]

---

[19] With respect to Plaintiff's argument that the ALJ's "only comment" on the issue of Plaintiff's persistent abdominal pain and steady weight loss found in Dr. Ostrowski's records was that he "is subject to periodic flares and fluctuations in weight" (Pl.'s Mem. at 11-12) (citing R. 16), the court disagrees. The ALJ also referred to Dr. Ostrowski's November 2000 report in which Dr. Ostrowski described Plaintiff's symptoms as "persistent crampy abdominal pain." *See*

## C.   Was the ALJ's Credibility Determination Erroneous?

In concluding that Plaintiff's testimony was not "entirely credible" (R. 18), the ALJ stated:

> Although he reports a worsening of his symptoms, he has not required any further testing, much less a referral to a gastroenterologist, thereby undermining his contention of increasing problems. His treating doctor's notes certainly do not support his assertion of increasing problems. Another issue is the frequency of bowel movements, which [Plaintiff] testified is unpredictable and up to six per day during a flare. However, his doctor documents three at most (Exhibit 8F), a considerable discrepancy.

(R. 17.)

Plaintiff argues that the ALJ's credibility determination failed to comply with SSR 96-7p. (Pl.'s Mem. at 12.) Curiously, Plaintiff does not cite any sections of SSR 96-7p in support of his argument. Instead, Plaintiff simply argues, "[SSR] 96-7p requires much more than that which was discussed by the ALJ." (*Id.*) Plaintiff then goes on to argue that the ALJ's credibility determination was erroneous because it failed to comply with the guidelines set forth in *Clifford*, 227 F.3d at 872. (Pl.'s Mem. at 12-13.) In *Clifford*, the court stated:

> If the allegation of pain is not supported by the objective medical evidence in the file and the claimant indicates that pain is a significant factor of his or her inability to work, then the ALJ must obtain detailed descriptions of claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. She must investigate all avenues presented that relate to pain, including claimant's prior work information and observations by treating physicians, examining physicians, and third parties. Factors that must be considered include the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for the relief of pain, functional restrictions, and the claimant's daily activities.

---

R. 16 (citing Exhibits 2F [R. 132-34] and 3F [R. 135-37]). Thus, while the ALJ could have been more thorough in her analysis on this point, Plaintiff's argument that she failed to address Plaintiff's abdominal pain altogether is without merit.

227 F.3d at 871-872.

Relying on *Clifford*, Plaintiff argues, first, that the ALJ's credibility determination was erroneous because the ALJ did not consider the consistency of Plaintiff's comments or his "good day/bad day" testimony regarding his limitations during an episode or flare-up. (Pl.'s Mem. at 13.) Defendant, in response, argues that the ALJ considered Plaintiff's statements regarding his limitations during a flare-up, but found them to be *inconsistent* with the medical evidence. (Def.'s Mem. at 11.)

The ALJ's conclusion that Plaintiff's testimony regarding his limitations during a flare-up was inconsistent with the medical records is not supported by the evidence. With respect to the issue of Plaintiff's daily bowel movements, which Defendant specifically relies upon, while the precise source of the ALJ's conclusion regarding the number of his bowel movements is unclear (the ALJ cited only "Exhibit 8F," an exhibit of 109 pages, in support of her conclusion), a progress note from July 6, 2000 reports "3-4" loose bowel movements per day (R. 191), a range that is distinct from the "three at most" cited by the ALJ (R. 17). Moreover, the July 6 progress report appears to be the only occasion on which Dr. Ostrowski recorded the number of Plaintiff's daily bowel movements; thus, Plaintiff's testimony does not contradict a longitudinal record regarding his bowel movements. Finally, and most importantly, Plaintiff did not even testify that he has up to six "bowel movements" per day. Plaintiff testified that he has to "use the bathroom" about six times per day, in part because he drinks more liquids during a flare-up to prevent dehydration. (R. 306.) The ALJ thus discounted Plaintiff's credibility based on a discrepancy created by the ALJ, not by the Plaintiff. Additionally, Plaintiff's "good day/bad day" testimony was not explored by the ALJ, although it is pertinent to the issue of Plaintiff's daily bowel movements. Thus, the ALJ's conclusion that there was a

"considerable discrepancy" between Plaintiff's testimony and the medical records on the issue of his bowel movements is not accurate. Similarly, as discussed above, the ALJ's conclusion that the medical records failed to support Plaintiff's testimony that his condition was worsening is not supported by the evidence. Thus, that conclusion cannot provide a proper basis for discounting Plaintiff's credibility, either.

Plaintiff also disputes the ALJ's credibility determination because it was based on Plaintiff's purported lack of treatment, including the fact that "he has not required any further testing, much less a referral to a gastroenterologist . . . ." (Pl.'s Mem. at 14) (citing R. 17). Plaintiff asserts that the ALJ's determination was not supported by the evidence because Plaintiff saw a gastroenterologist in May 2000 when he underwent a colonoscopy. (*Id.*) (citing R. 142-43). Defendant responds that the ALJ's comment was in reference to the time period after May 2000 because "[t]he ALJ clearly was aware of and considered Plaintiff's treatment by a gastroenterologist, Dr. Sangchantr, in May 2000." (Def.'s Mem. at 13.) Defendant argues that Plaintiff's argument is irrelevant anyway as "no change in treatment was made at that time," "[f]indings were generally normal," and "[n]o surgery was recommended." (*Id.* at 12.)

The ALJ appears to have been aware of Plaintiff's treatment by a gastroenterologist in May 2000, as Defendant argues, because she discussed the colonoscopy performed by Dr. Sangchantr in May 2000, and cited "Exhibit 1F" in support of her discussion, which contained the gastroenterologist's medical records on that issue. (R. 16.) Thus, the ALJ may have meant that Plaintiff had not required a referral to a gastroenterologist *after* May 2000, as Defendant argues. However, that conclusion is not borne out by the record, either. Dr. Sangchantr provided an opinion regarding Plaintiff's condition in December 2000 – seven months after the colonoscopy – which the

ALJ failed to address in her decision. In addition, Plaintiff testified that after his colonoscopy in May 2000, Dr. Sangchantr switched his medication, and that "Dr. Ostrowski would tell [Dr. Sangchantr] [Plaintiff's] condition and then [Dr. Sangchantr] would give him the go-ahead." (R. 316.) Plaintiff further testified that he has limited funds and is without health insurance, and does not "usually deal with [Dr. Sangchantr] unless [his] condition is such to where [he] believe[s] [he] need[s] to go into the hospital." (R. 315-16.) The ALJ did not discuss or acknowledge any of these factors, although they tend to negate the ALJ's conclusion that Plaintiff had not been referred to a gastroenterologist.

Because the ALJ's conclusion regarding Plaintiff's credibility is based, in part, on factual findings not supported by the record, the ALJ's credibility determination also requires that the case be remanded.[20]

---

[20] In further support of his argument that the ALJ's credibility determination was erroneous, Plaintiff argues that the ALJ failed to consider his work history, including his excessive absenteeism that led to the termination of his most recent job; failed to consider the side effects of his medication, including evidence that his medication might cause drowsiness; and erred in concluding that he could perform sedentary work during a flare-up based on Dr. Ostrowski's report. (Pl.'s Mem. at 13-14.) Because the court finds the ALJ's credibility determination to be erroneous for the reasons discussed above, it is not necessary to address Plaintiff's additional arguments on this issue.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is granted, Defendant's motion for summary judgment is denied, and the case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. This is a final judgment and order.

IT IS SO ORDERED.

Geraldine Soat Brown
United States Magistrate Judge

April 8, 2004